Jeffery L. SWARTZ and Sam
Foos, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 448–85C, 449–85C.

United States Claims Court.

March 30, 1988.

David F. Allen, Marysville, Ohio, for plaintiffs.

Eric L. Miller, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

These consolidated cases arise from the receipt in 1982 by Jeffery L. Swartz and Sam Foos (plaintiffs) of separate Commodity Credit Corporation (CCC) farm-stored soybean loans. The Union County, Ohio Agricultural Stabilization and Conservation Service (ASCS), acting as the local representative of CCC, disbursed the loans to each plaintiff and received therefor executed farm-storage notes and security agreements. Upon the ultimate sale of the soybeans securing the loans, the CCC received checks from the elevator company in curtailment of plaintiffs' loans. These checks were not honored when presented for payment due to insufficient funds. Both plaintiffs, by different methods, subsequently paid off their loans.

On August 5, 1985, after exhausting their respective administrative remedies, plaintiffs independently brought suit in this court seeking a refund of those monies allegedly wrongfully demanded by and paid to CCC in curtailment of their loans. Because of similarity of the legal issues, defendant moved to consolidate the separate cases on January 29, 1986. This court granted said motion finding that under RUSCC 42 the two cases presented a "com-

mon question of law [and] fact." [1] Consequently, herein we shall separately recount the undisputed facts of each plaintiff's case separately and then discuss the law applicable to both cases.

As previously noted, each plaintiff had exhausted his administrative remedies through adjudication at ASCS and appealed to the Secretary of Agriculture before filing suit here. By means of a motion for summary judgment, Foos and Swartz now challenge in this court the legality of the final decision of the Secretary of Agriculture that denied their appeals and upheld the prior ASCS decisions not to refund the amounts paid by plaintiffs in curtailing their respective loan balances. In that connection, Foos seeks a refund of $11,659.07 and Swartz seeks a refund of $14,423.20. Jurisdiction lies under 28 U.S.C. § 1491.[2] Defendant, in opposition, has filed a cross-motion for summary judgment which contains a counterclaim against Foos. On the basis of the administrative record, we grant defendant's motion and deny plaintiffs' motion(s) for the reasons discussed *infra.*

*Facts*

A. *The Commodity Credit Corporation*

In 1949 Congress passed the Commodity Credit Corporation Charter Act, 15 U.S.C. §§ 714–714p (1982), *i.e.,* the Act. Under the Act, CCC is established as an instru-

mentality of the government within the Department of Agriculture through which the Secretary is authorized to apply public funds to support and stabilize farm prices and acts to ensure a "balanced and adequate supply of farm products." *Id.* at § 714. The farm-storage loan program, in which plaintiffs participated, is administered under the Agricultural Act of 1949, 7 U.S.C. §§ 1421–1468 (1982), and regulations found at 7 C.F.R. Part 1421 (1983). Said loan program is directly administered by the state and county committees of the Agricultural Stabilization and Conservation Service of the Department of Agriculture (ASCS) following a general delegation of the administration of CCC's Commodity Support Programs in December of 1972. 7 C.F.R. § 1421.2(a), 7 C.F.R. § 2.65(a) (1983). In each county, farmers elect the members of the county committee, which is supervised by the state committee consisting of three to five farmers appointed from the state by the Secretary of Agriculture. The federal oversight of the programs is through the Deputy Administrator, State and County Operations (DASCO). *See Gibson v. United States,* 11 Cl.Ct. 6, 8 (1986). An overview of the mechanics of the program, at this posture, would undoubtedly be illuminating.

To initiate program participation, a producer of a commodity crop requests a price support loan at the local ASCS office. 7 C.F.R. at § 1421.6. Following approval,

---

**1.** RUSCC 42, entitled Consolidation; Separate Trials, provides in pertinent part as follows:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

**2.** *See Alimenta (USA), Inc. v. Block,* 636 F.Supp. 850 (N.D.Ga.1986). In *Alimenta,* the District Court transferred an action for review of a final determination by the Department of Agriculture acting through the CCC to the Claims Court due to the fact that the United States was the real party in interest and the ultimate goal of this action was to recover a sum of money in excess of $10,000. As a basis of its decision, the *Alimenta* court found that 15 U.S.C. § 714b(c) in-

corporated the amount in controversy requirement of the Tucker Act. *See also* 15 U.S.C. § 714b(c) which provides in pertinent part: "Any suit by or against the United States as the real party in interest based upon any claim by or against the Corporation shall be subject to the provisions of the subsection (c) of this section, to the same extent as though such suit were by or against the Corporation, except that (1) any such suit against the United States based upon any claim of the type enumerated in section 1491 of Title 28, may be brought in the United States Claims Court, and (2) no such suit against the United States may be brought in a district court unless such suit might, without regard to the provisions of sections 714 to 714p of this title, be brought in such court." Defendant does, however, challenge subject matter jurisdiction but, as we demonstrate in the discussion *infra,* plaintiffs' cases are properly brought in this court.

ASCS then disburses the loan against a percentage of the stored commodity crop. *Id.* at § 1421.17. The State ASCS committee fixes the applicable percentage (*i.e.*, the loan percentage) of each certified crop as to which the loan may be made. *Id.* The commodity securing the loan, under the farm-storage loan program, is stored in an approved sealed storage facility on the producer's farm. *Id.* The commodity is withheld from sale, under this program, on the open market which literally causes the supply to diminish and the price to stabilize or increase. Should the market price go above the loan amount, the producer can sell the stored crop, repay the loan, and retain the excess. To sell the stored commodity crop in order to repay the loan, the producer must *first* obtain the written approval of the county ASCS to remove a specified amount of the commodity from storage. *Id.* at § 1421.18(a). This authorization to permit the producer to sell some or all of the stored commodity does *not* function to release the CCC's security interest in the commodity or to "release the producer from liability for any amounts due on the loan indebtedness if full payment of such amounts is not received by the county." *Id.*

Further, the CCC will not release the producer from the obligation incurred under the promissory note and will not release the security agreement covering the commodity until it has received full repayment of the loan. *Id.* at § 1421.18(b). In other words, the producer must either pay off the loan or deliver to CCC an amount of the stored commodity sufficient to cover the balance of the loan. *Id.* at § 1421.19(a). Regulations provide that in the event that after the CCC has disbursed the loan and there is a loss in quantity or quality of the farm-stored commodity, CCC will bear the loss *only* if all of the following conditions are met:

1. The producer has immediately reported the loss to the county ASCS;

2. Neither the producer nor another in control of the storage facility was responsible for the loss due to either's negligence or fault;

3. *The loss was due to an external cause*, occurred without the knowledge or consent of the producer, and in the case of theft, the theft was *not by a person "entrusted with possession of the commodity"* (emphasis added); and

4. The producer has not made any false or fraudulent statements in the loan application. *Id.* at § 1421.15.

In other words, if the producer can show that he has met *all* four of the above-enumerated conditions, then CCC will forgive the loan and absorb the loss.

The appeal process for challenging determinations of a county committee are outlined at 7 C.F.R. Part 780 (1983). The farmer may receive reconsideration and an informal hearing from the county committee. *Id.* at § 780.3. From the reconsideration, the appeal goes to the state committee and finally to the Deputy Administrator. *Id.* at § 780.4, § 780.5.

**B.** *Facts Re Sam Foos*

Plaintiff Foos received two farm-storage loans from CCC and in turn executed two farm-storage notes and security agreements, one on October 8, 1982 and the other on October 28, 1982. Thirty-six hundred (3600) bushels of soybeans secured the October 8th loan for $18,000.00 and 9,000 bushels of soybeans secured the second loan for $45,450.00. The collateralized soybeans remained on plaintiff's farm in the sealed storage facilities until Foos received an oral authorization from ASCS to remove the same from storage on February 9, 1983, and to sell 404 bushels of soybeans on the first note and 1,597 bushels on the second note.

On the same day that he received the oral release, *i.e.*, February 9, 1983, Foos sold and delivered the released soybeans to the grain elevator, Richwood Feed and Grain Company (Richwood). Subsequently, Richwood issued two checks, one for the sum of $10,442.19 on February 14, 1983, and another for $47.31 on March 10, 1983, to CCC through the county ASCS. Defendant did not deposit the checks with the Federal Reserve until March 14, 1983,

about one month after receiving the first check and four days after receipt of the second check. These checks were returned for insufficient funds in April of 1983, inasmuch as Richwood filed a Chapter 11 petition in bankruptcy on March 17, 1983. Later, the Chapter 11 petition was converted into a Chapter 7 petition in bankruptcy. As a consequence of the dishonored checks, plaintiff was constrained to repay the entire loan balance on or about February 9, 1984, in the total amount of $11,659.67 in order to enable him to continue to participate in other government programs. Plaintiff, having received neither compensation nor the return of his soybeans from Richwood, now strenuously argues that the elevator company committed theft or converted the soybeans to its own use and benefit.

### C. *Facts Re Jeffery Swartz*

Similarly, Swartz also received a farm-storage loan from CCC in the amount of $46,680.30. In consideration therefor, he executed a farm-storage note and the security agreement covering 9,246 bushels of soybeans on or about October 18, 1982. After receiving an oral authorization from the ASCS county office on February 21, 1983, to remove the collateral from storage, Swartz sold and delivered 2,815 bushels of the stored soybeans to Richwood on February 25, 1983. Later, however, plaintiff discovered, on or about March 9, 1983, that a portion of the sale proceeds ($14,-791.98) had not been credited to his account with the county ASCS. This amount was the balance due on his farm-storage loan. Upon inquiry, Swartz learned that the ASCS office had not forwarded the official marketing authorization form to Richwood, leaving Richwood without direction as to whom should receive payment and in what amount. In order to expedite payment,

given the foregoing, plaintiff instructed Richwood to issue the check to the order of CCC. And, on March 11, plaintiff personally obtained the check in the amount of $14,791.98 from Richwood, and on March 15 delivered it to the ASCS county office. ASCS then deposited the check on March 18, 1983, *after* Richwood declared bankruptcy. Understandably, this check was also dishonored on or about April 8, 1983, due to insufficient funds. Defendant has set-off against the loan balance due it by plaintiff for the amount of the dishonored Richwood check (*i.e.,* $14,791.98) other program funds then due and payable to plaintiff. Plaintiff was also charged a bad-check fee of $25.00 for Richwood's bad check. As in Foos' case, Swartz received neither payment nor the return of his property (the soybeans) from Richwood and similarly contends theft of his property by Richwood and release from the loan obligation under the applicable loan contract provisions.

### *Contentions of the Parties*

#### A. *Plaintiffs*

Swartz and Foos, in a consolidated motion, move for summary judgment premised on the following four arguments. First, the Claims Court has the authority to review the law applied by the Secretary of Agriculture in their administrative hearings under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982).[3] Second, the government should bear the loss occasioned by Richwood's bankruptcy due to the provision within the loan note that allows foreignness of the debt *if* the loss of the security commodity is due to *theft.* Third, says plaintiffs, the government's unreasonable delay in issuing its marketing authorization forms and in depositing Richwood's payment check were the primary causes of the check not clearing. Fourth,

---

**3.** 5 U.S.C. § 706(2)(A) provides as follows:

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

and finally, the authorization of plaintiffs' sale to Richwood, by defendant, and defendant's receipt of Richwood's check in payment worked a novation releasing plaintiffs from their obligation to repay the CCC loans and in turn substituting Richwood as the debtor. Finally, plaintiffs argue that, should their joint motion be denied, these cases should be remanded to the Department of Agriculture inasmuch as the administrative proceedings held at that agency were not fairly conducted due to the local committees' misperception of their authority.

### B. *Defendant*

In its filed answer, defendant pled a counterclaim against plaintiff Swartz for an alleged unpaid balance of $4,349.31 on his farm-storage loan plus a $25.00 bad check fee. Since the filing of said answer, however, defendant has now acknowledged that it was "able to recover the [entire] amount of Mr. Swartz's [unpaid] loan by means of [an] administrative offset" (Defendant's Cross–Motion for Summary Judgment). Consequently, at this point we take defendant's representation to constitute an abandonment of any counterclaim; and, therefore, the court finds that defendant's counterclaim is moot and dismisses it.

However, in its cross-motion for summary judgment, defendant counters each of plaintiffs' four positions averred for relief. First, it argues that either the operative statutory provisions of 7 U.S.C. § 1429 (1982)[4] precludes review entirely, or limits review to the single inquiry—whether the Secretary's administrative decision is legally consistent with the Commodity Credit Corporation Charter Act. Second, the loan note provision that allows forgiveness of the debt due to theft does not apply in plaintiffs' case because the regulations at 7 C.F.R. § 1421.15 preclude relief in situations where a third party with consensual possession perpetrates the "theft," such as in plaintiffs' cases. Third, plaintiff Swartz

himself unreasonably contributed to the so-called delay in receiving Richwood's payment check on March 11, 1983 and holding it for four days before turning it over to ASCS on or about March 15, 1983. This circumstance is obviously culpable, says defendant, because Richwood did not file its petition in bankruptcy until March 17, 1983.

Further, argues defendant, plaintiffs point to no specific regulation violated or contract provision breached by defendant resulting from its method of processing plaintiffs' marketing authorization paperwork and/or the payment checks. The court notes that this contention of defendant tacitly raises a subject matter jurisdiction issue since jurisdiction lies in this court only if plaintiffs base their substantive right on a statute, regulation, or contract provision that mandates money damages against the United States. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Fourth, the alleged novation, which arguably extinguished plaintiffs' obligations under the loan contract, would be precluded by program regulations that do not provide the requisite authority for ASCS agents to approve such an arrangement. Lastly, defendant argues that a remand because of alleged improper perceptions of administrative authority by the county committee is inappropriate here since the operative regulations clearly deny, as did the committee, the relief sought in this court.

### Issues

Since defendant has raised a challenge to subject matter jurisdiction, the threshold issue is—whether plaintiffs' claims fall within this court's limited jurisdiction. Should we find jurisdiction to be properly laid, then the focus will shift to the second issue of determining—whether a remand to the Department of Agriculture is in order due to actual irregularities in the administrative hearings. If we do not find that a remand is appropriate, the court will then

---

**4.** 7 U.S.C. § 1429 provides as follows:
§ 1429. Determination of Secretary as final and conclusive
  Determinations made by the Secretary under this Act shall be final and conclusive:

*Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.

inquire into the availability and scope of review here—*i.e.,* the third issue is whether review is available under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1982), or whether review is limited or precluded under the Agricultural Act of 1949, as amended, 7 U.S.C. §§ 1421–1468 (1982). Finally, if review is available, the court will determine whether the ASCS committees applied the law correctly and whether any loan contract provision or program regulation provides relief for plaintiffs. With respect to the novation issue, for the reasons expressed below, the court finds the issue to be specious.

*Discussion*

### A. *Subject Matter Jurisdiction*

■ Defendant argues that since plaintiffs identify no regulation that ASCS violated and no contract provision that it breached, jurisdiction does not lie in this court. We reject this argument simply because plaintiffs strenuously argue that defendant breached loan contract provision 6(j)—which provides for forgiveness of the producer's debt if the reduction in quantity of the commodity securing the loan is due to "theft." Having unambiguously alleged breach of contract, our jurisdiction is sufficiently engaged. Further, plaintiffs also advance the claim that they have erroneously paid money to the government and now seek its return. The predecessor Court of Claims in *Hazel V. Kirkendall v. United States,* 31 F.Supp. 766, 90 Ct.Cl. 606, 613 (1940), has held that an implied-in-fact contract under the Tucker Act arises on the part of the government to make restitution to a citizen whose money it has erroneously or illegally received. The predecessor Court of Claims has found this type of implied contract claim to be within its subject matter jurisdiction. Since plaintiffs here seek restitution for monies allegedly wrongfully paid to the government under the farm-storage loan program, under *Kirkendall,* we find that their claims are within this court's jurisdiction.

### B. *Remand to the Department of Agriculture*

■ Before this court, plaintiffs allege that the administrative procedures conducted below were "tainted" by the misperception on the part of the county committee that its authority was limited, and precluded granting plaintiffs relief. The plaintiffs' misconception apparently stems from their misconstruing the statement made by the chairman of the county committee, David M. Hall, who heard the appeal(s) of Mr. Swartz and Mr. Foos. Mr. Hall, when deposed, stated:

> Well, I'm not sure how much authority the Committee had. I was kind of led to believe that it was ... the State [committee] pretty much had to give authority whether we [the county committee] could ... accept this or not [*i.e.,* forgive the loan] ... *we did feel that we wanted to do whatever we could,* and I think that our hands was [sic] kind of tied by what the rules and regulations were....

(emphasis added). That same sentiment, expressed on the part of the county committee, was reflected in its letter to each plaintiff dated October 3, 1983, wherein the statement was made: "[t]he county committee does have sympathy and empathy for you and did go on record to give you all relief within their [sic] regulations."

We perceive plaintiffs' contention to be, in view of the quoted statements, that the county committee was in fact willing to forgive their loans but did not do so because their "hands was [sic] kind of tied" not because of a legal impediment, but rather simply because the state committee would not authorize relief otherwise permissible. However, after reviewing the record, we find that plaintiffs are the ones operating under a misconception regarding the committee's authority, the applicable law, and the appropriateness of a remand. The letter of October 3, 1983, from the county committee to each plaintiff clearly states that *program regulations* prevented the committee from granting relief. As we demonstrate below, the regulations at 7 C.F.R. § 1421.15 and § 1421.18(b) (1983) clearly precluded the relief sought by plaintiffs and correctly barred the county committee from granting such relief. Furthermore, the program regulations unambiguously limit the authority of both the state

and county committees as follows: "State and county committees ... do *not* have authority to *modify* or *waive* any of the provisions of the regulations in this subpart." *Id.* at § 1421.2(c) (emphasis added). Clearly then, both the county and state committees were constrained by said provisions to operate within the regulations as they existed. Despite the fact that the October 3rd letter is conclusory, we find, nevertheless, that the county committee did correctly exercise their authority to apply the law and reached the proper legal conclusion; therefore, we deny the request for remand.

C. *Review of the Secretary's Determination*

■ With respect to the third issue posited, we begin by stating that generally there is a presumption in favor of judicial review of administrative acts. In that connection, we observe that "[j]udicial review of a final agency action ... will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). This presumption underlies the Administrative Procedure Act, 5 U.S.C. § 701–706 (1982) (APA). *Id.* Thus, review is only *unavailable* in two distinct cases under the APA: first, if it is specifically precluded by statute; and second, if the administrative action has been committed, by statute, to the agency discretion. 5 U.S.C. § 701(a) (1982). *Gonzalez v. Freeman,* 334 F.2d 570, 575 (D.C.Cir.1964). In order to review an agency action, the court must, therefore, determine whether review is available under one of the foregoing criteria; and, if it is, what is the scope of such review. To determine whether judicial review is available, the court must, of course, focus on the legislation under which the agency acted to identify the intent of Congress as regards review of that administrative action. *Association of Data Processing Service Organizations, Inc. v. United States,* 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970). Especially in a case involving an administrative action adjudicating private rights, *preclusion* of judicial review is *not* to be casually inferred from the statute. *Id.*

■ Defendant argues here that review of the Secretary's decision is precluded by 7 U.S.C. § 1429 (1982)[5] unless said determination is *inconsistent* with the Commodity Credit Corporation Charter Act, 15 U.S. C. §§ 714–714p (1982). For that point, defendant supports its contention by apparently embracing the holdings in *Carruth v. United States,* 224 Ct.Cl. 422, 627 F.2d 1068 (1980), and *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964).

With regards to § 1429, it provides, in pertinent part, as follows:

Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.

However, we find that defendant's reading of these cases interpreting § 1429 is misplaced. The D.C. Circuit in *Gonzalez, su-*

---

**5.** Defendant claims that 7 U.S.C. § 1385 (1973) also bars review. However, defendant articulates no reason why this statute also applies to plaintiffs' cases. Section 1385 provides in pertinent part that:

> The *facts* constituting the basis for any payment under the Soil Conservation and Domestic Allotment Act, as amended, parity payment, payments under the cotton set-aside program, payments (including certificates) under the wheat and feed grain set-aside programs, payment under section 1339 of this title, loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Com-

modity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government. (emphasis added). After reviewing both § 1429 and § 1385, we find that the farm-stored loan program in which plaintiffs participated is not included in the program covered by § 1385, consequently § 1385 is inapplicable. If § 1385 were controlling, however, case law indicates that only review of *factual* determinations is precluded, not review of questions of law, as in issue here. Thus, the legal results in the case at bar regarding permissible review of *questions of law,* under either statute, is the same. *See, e.g., Gross v. United States,* 205 Ct.Cl. 605, 505 F.2d 1271 (1974).

*pra,* specifically states that it found no Congressional intent in § 1429 to withhold judicial review in cases involving individual administrative adjudications. *Id.* at 575. *Gonzalez* concerned a contractor debarment proceeding found invalid by the court in the absence of procedural regulations legally promulgated. The *Gonzalez* court specifically states that: "[i]n short *far from precluding judicial review this statute authorizes it,* and 'the responsibility of determining the limits of statutory grants of authority ... is a judicial function entrusted to the courts by Congress....' " (emphasis added). *Id.* citing *Stark v. Wickard,* 321 U.S. 288, 310, 64 S.Ct. 559, 571, 88 L.Ed. 733 (1944). Likewise, we note that the Court of Claims in *Carruth* does *not* set up an austere test blandly setting the parameters of review to consist of simply determining—whether the Secretary's decision was or was not consistent with the Commodity Credit Corporation Charter Act. In other words, in that case that court does not state that only those decisions found inconsistent shall merit review. Rather, under *Carruth,* judicial review is generally available but limited in scope to the determinations of whether the Secretary acted rationally and within his statutory authority. *Id.* at 437, 627 F.2d at 1076.

Similarly, in the case at bar, we also find that judicial review is generally available under § 1429 "to determine that he [the Secretary] has acted rationally and within his statutory authority." *Carruth,* 224 Ct.Cl. at 437, 627 F.2d at 1076 (1980). Moreover, aside from factual determinations and determinations of authority, the court may also review such agency determinations, on issues of law, *de novo* under 5 U.S.C. § 706 (1982), which provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.

Clearly then § 706, *supra,* includes *de novo* review of a statutory construction by an agency. In fact, in cases where the dispute centers on the meaning of a statutory term, the judicial function of statutory construction will provide the definitive resolution and the area of expertise of the agency is *not* involved. *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970). *See also Rice v. Wilcox,* 630 F.2d 586 (8th Cir.1980) (§ 706 directs courts to review findings of law *de novo* ).

■ Plaintiffs argue, against this background, that this court should set aside the agency conclusion, that they are not entitled to a refund of their monies paid to curtail their respective loans as arbitrary and capricious, as not in accordance with law under 5 U.S.C. § 706(2)(A). We find, however, that the contrary finding is appropriate in that plaintiffs have failed to meet their burden of showing that the Secretary's decision, that relief was not legally available to plaintiffs, was arbitrary and capricious.

The legal controversy here hinges on plaintiffs' position that the "theft" of the commodities, after delivery of the grain to Richwood, under the contract provisions, absolves them of any liability with regard to the loan note balances as secured by the "stolen" grain. Thus, the dispute here turns on the definition of the contract term "theft." In the body of the promissory notes signed by each plaintiff, provision 6(j) provides as follows:

(j) Loss in Quantity or Quality. The producer is responsible for any loss in quantity or quality of the commodity placed under farm-storage loan. Notwithstanding the foregoing, and *subject to Program Regulations relating to insurance on farm-storage loans and limitation of losses,* physical loss or damage occurring after disbursement of the loan funds will be assumed by CCC to the extent of the lower of (i) the settlement value at the time of destruction of the quantity of the commodity destroyed or (ii) the damage as determined by CCC, less the salvage value of the commodity, if the producer established to the satisfaction of CCC each of the following conditions: (1) the physical loss or dam-

age occurred without fault, negligence, or conversion on the part of the producer, or any other person having control of the storage structure; (2) the physical loss or damage resulted solely from an external cause (other than insect infestation, rodents, or vermin), such as theft, fire, lightning, inherent explosion, windstorm, cyclone, tornado, flood, or other acts of God; (3) the producer has given the county committee immediate notice of such loss or damage; and (4) the producer has made no fraudulent representation in the loan documents or in obtaining the loan. No physical loss or damage occurring prior to disbursement of the loan funds to the producers will be assumed by CCC.

(emphasis added).

Plaintiffs seek relief under the foregoing provision, claiming that the CCC should now assume the loss, due to Richwood's dishonored check, since the actual loss ultimately resulted from the grain elevator's (Richwood's) theft of plaintiffs' soybeans that secured the loans. The "theft," say plaintiffs, stems from the insufficient funds and the conversion of the soybeans and is covered under provision 6(j). However, plaintiffs err in overlooking the following operative language of contract provision 6(j)—"subject to Program Regulations relating to ... *limitation of losses*" (emphasis added). While under certain *specific* circumstances, paragraph 6(j) of the contract provides that—"physical loss ... occurring after disbursement of the loan funds will be assumed by CCC ...," the terms and conditions of the loan contract, *supra,* clearly refer to applicable regulations on loss limitation such as 7 C.F.R. § 1421.15 (1983). This section defines the term "theft" for purposes of loan forgiveness at paragraph (b) as:

(b) The physical loss or damage resulted *solely* from an external cause (other than insect infestation, rodents, or vermin) such as *theft* by a person *not entrusted with possession of the commodity* and occurring without the knowledge or consent (express or implied) of the producer, fire, lightning, explosion, wind-

storm, cyclone, tornado, flood, or other act of God;

(emphasis added).

In plaintiffs' case, this regulatory definition of "theft" bars recovery since clearly plaintiffs here entrusted the grain elevator, *i.e.,* Richwood, with possession of the soybeans in order to market them. Thus, since Richwood, under the regulations, is not a person not entrusted with possession of the commodity, there is no "theft" under the Act sufficient for the loss at bar to be "assumed by CCC" as provided in paragraph 6(j), *supra.* Consequently, 7 C.F.R. § 1421.18(b) holds plaintiffs responsible for full curtailment in that it provides that—"[t]he note and security agreement shall not be released until the loan has been satisfied in full." We, therefore, hold that the Secretary has correctly interpreted and applied this regulation denying plaintiffs the relief sought.

### D. *Novation and Delay*

Since plaintiffs did not raise a novation argument below during their administrative adjudication, and since our review is limited by statute, they cannot raise this argument here for the first time. Therefore, the novation argument likewise fails. Furthermore, this court finds that in light of the bar to recovery determined to exist at 7 C.F.R. § 1421.15 as stated above, the delay in forwarding the checks or the paperwork on either party's part is irrelevant.

*Conclusion*

For the reasons stated above, plaintiffs' motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. The Clerk shall enter judgment accordingly. Costs shall be assessed against plaintiffs.

IT IS SO ORDERED.