David W. ROBINSON, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 09–142 T.

United States Court of Federal Claims.

Jan. 4, 2011.

David W. Robinson, Oxford, MS, pro se.

Shelley D. de Alth, United States Department of Justice Tax Division, with whom were John A. DiCicco, Acting Assistant Attorney General, Stephen I. Frahm, Chief,

Court of Federal Claims Section, G. Robson Stewart, Assistant Chief, Washington, DC, for defendant.

## OPINION

BUSH, Judge.

This case is before the court on cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), as well as defendant's motion to dismiss a portion of the complaint pursuant to RCFC 12(b)(1). These motions have been thoroughly briefed, and oral argument was neither requested by the parties nor deemed necessary by the court. The dispositive issue before the court is whether plaintiff was under duress when he paid the tax liability of a corporation owned by his son and daughter-in-law. For the reasons set forth below, the court grants defendant's motions, denies plaintiff's motion and must dismiss the complaint.

## BACKGROUND[1]

The court begins with an introduction of the Robinson family, because this case springs from the interactions of an extended family, a failing electrical wiring business and the Internal Revenue Service (IRS).[2] Plaintiff David W. Robinson is a retired businessman who has some background in accounting. Compl. at 9; Def.'s Facts ¶ 18. He is married to Sherri Robinson, who continues to run and is the sole employee of Systems Plus, LLC, a business plaintiff began in 1998 and retired from in 2007. Def.'s Facts ¶ 18; Pl.'s App. E at 26–27, 30. Mr. Robinson has prepared and filed many of the tax forms for Systems Plus over the years, although the business has also used accounting firms for this purpose. Pl.'s App. E at 28, 30.

Plaintiff has dealt with the IRS in a personal tax dispute as well as in the dispute at issue in this suit. Pl.'s App. E at 42–44. When the IRS questioned Mr. Robinson's and his wife's personal income tax returns, he eventually hired an attorney specializing in tax matters, Mr. Brad Walsh. *Id.* at 45–46. Mr. Walsh filed a suit in the United States Tax Court on behalf of plaintiff and his wife just a few months before the event that is under review in this suit took place. Def.'s Facts ¶ 91.

Plaintiff's son, Peyton Robinson, along with his wife Brooke Robinson, operated an electrical wiring business, Robinson Enterprises, Inc., which was incorporated in 2003. Def.'s Facts ¶ 1. Despite using accounting firms to calculate and pay taxes owed to the federal government, Robinson Enterprises was not timely in paying various tax obligations to the United States, beginning in 2004. *Id.* ¶ 5. In late 2004, Peyton Robinson informed his father that Robinson Enterprises had cash flow problems. *Id.* ¶ 19. Early in 2005, the IRS began collection activities against the business. *Id.* ¶ 32.

Plaintiff assisted his son Peyton in many ways during these difficult times. He paid approximately $7500 to a creditor of Robinson Enterprises, most of which Peyton and Brooke were not able to repay. Def.'s Facts ¶ 19. Debts then continued to mount, both for Robinson Enterprises, as well as for Peyton and Brooke as individuals. By early 2006, Mr. Robinson learned that Peyton was in financial trouble, and plaintiff began to help his son sort through his mail and manage his financial affairs. *Id.* ¶ 22. Plaintiff paid some of the bills of Robinson Enterprises. *Id.* ¶ 24. Mr. Robinson also paid some of Peyton's individual debts, including, as Peyton and Brooke's marriage deteriorated, the costs of a divorce attorney. *Id.* ¶ 26.

---

1. The facts recounted here are taken from the parties' pleadings and briefs, and appear to be undisputed for the purpose of deciding defendant's motions, unless otherwise noted. *See* Def.'s Mot. at 3. Plaintiff did not file his own proposed findings of uncontroverted fact, and the facts presented in the complaint are contained in two brief sentences. The court's recitation of facts therefore relies extensively on facts provided by defendant. The court makes no findings of fact in this opinion.

2. The court will refer to Mr. David W. Robinson as plaintiff or Mr. Robinson. For the sake of simplicity, all other individuals with the last name Robinson will be referred to either by their first, or first and last names. The court does not intend these references to imply a lack of courtesy toward these persons.

Peyton and Brooke separated at the beginning of 2006. Def.'s Facts ¶ 11. By the end of 2006 Robinson Enterprises had stopped functioning, although the corporation never filed for bankruptcy. Id. ¶ 12. Peyton Robinson filed for personal bankruptcy in 2007. Id. ¶ 13. Peyton and Brooke were divorced in 2008. Id. ¶ 14.

The collection efforts of the IRS against Robinson Enterprises focused on employment taxes; the statutory bases of these "payroll taxes," Def.'s Facts ¶ 34, are largely immaterial to this suit.[3] Plaintiff does not dispute that these payroll taxes were owed by Robinson Enterprises. Id. ¶ 7. The early collection actions of the IRS included mailing a request for payment to the corporation, Def.'s App. at 137,[4] and sending a revenue officer to meet with Peyton Robinson at his home, Def.'s Facts ¶ 34. The IRS also corresponded with the corporation's accountant, and the revenue officer again visited Peyton at his home on November 7, 2005. Def.'s Facts ¶ 35. Apparently a payment plan was discussed, and Peyton was also notified that, as a corporate officer, he might be liable for some portion of the delinquent taxes of Robinson Enterprises, for failure to collect and pay over "withheld income and employment taxes." Id. ¶ 35 & n. 4.

Robinson Enterprises hired Mr. Brad Walsh, a tax attorney, in December 2005. Def.'s Facts ¶ 40. Mr. Walsh is the same tax attorney that represented plaintiff in a separate, but roughly contemporaneous, tax dispute. At about this time, Ms. Rita Thames was the revenue officer assigned to the Robinson Enterprises case. Id. ¶ 42. Mr. Walsh and Ms. Thames discussed installment payment plans, but over the next few months these discussions (on the telephone, in person, and through correspondence), did not result in a payment plan. Ms. Thames would not agree to an installment payment plan until Robinson Enterprises met deadlines for filing documents and for making deposits on

current tax liabilities. Deadlines were set and missed. See Def.'s Facts ¶¶ 35, 45, 49, 51.

As Robinson Enterprises continued to fail to pay its 2004 and 2005 employment taxes, the IRS resorted to filing liens and levying on the corporation's bank account in early 2006, and collected almost $6000 in April 2006. Def.'s Facts ¶¶ 36–38. On April 24, 2006, Ms. Thames sent a summons to the corporation to appear before her on May 15, 2006. Id. ¶ 51. At about this time, plaintiff had listened in on a conference call between Mr. Walsh, Peyton and Ms. Thames, and decided that his intervention in the dispute might lead to "a resolution of Peyton's payroll tax obligations." Pl.'s App. E at 107–08. Therefore, plaintiff "called Rita Thames in advance [of the May 15, 2006 summons date] to see if [they] could work something out." Id. at 90–91. A meeting was set up for May 12, 2006.

It is clear that one potential outcome of the meeting arranged between Mr. Robinson and Ms. Thames would be a payment from plaintiff toward the tax liabilities of Robinson Enterprises. See, e.g., Pl.'s App. E at 112–13; Def.'s Facts ¶ 57; Pl.'s Reply § III ("I was prepared to pay an agreeable amount."). Plaintiff asserts that he was not, however, prepared to pay the entire amount owed for 2004 and 2005, which was computed by Ms. Thames to be $12,279.22. Pl.'s App. E at 113; Def.'s Facts ¶ 72. The attendees of the May 12, 2006 meeting were: Plaintiff, his wife Sherri, Peyton, Angela Robinson (plaintiff's daughter-in-law, a Certified Public Accountant (CPA)), and Ms. Thames. Mr. Walsh, the tax attorney for Robinson Enterprises, was not invited by plaintiff to attend, to avoid the expense of his representation. Def.'s Facts ¶ 63.

Defendant, for the purposes of its motions, does not dispute the following description of the events of the May 12, 2006 meeting. There was a detailed discussion of the

---

3. The tax quarters involved in the collection efforts at issue in this case included the fourth quarter of 2004 and the third and fourth quarters of 2005. Def.'s Facts ¶ 39. The IRS had previously filed a lien against Robinson Enterprises and successfully collected taxes for the third quarter of 2004. Id. ¶ 32.

4. All references to Defendant's Appendix are to Appendix B, with page numbers changed from, for example, "B–30" to "30."

amount of tax, including penalties and interest, owed as of the date of the meeting. Def.'s Facts ¶ 65. Ms. Thames rejected both an installment payment plan and an offer to settle the case for less than what was owed. *Id.* ¶ 68. Plaintiff suggested that because Peyton and Brooke were each responsible officers of the corporation, Peyton's share of the liability would be satisfied if plaintiff were to pay half of the amount owed by Robinson Enterprises. *Id.* ¶ 70. Ms. Thames rejected this offer, apparently stating that "assessments are set up against all responsible parties and not divided since each are equally responsible for the full debt." Def.'s App. at 222. Plaintiff then asked what would happen if the taxes were not paid. Ms. Thames stated that if the taxes were not paid, an arrest warrant would issue and Peyton and Brooke would go to jail. *See* Def.'s Facts ¶ 71 (noting that this version of events conflicts with Ms. Thames' version). Mr. Robinson then wrote a check for $12,279.22 to pay the employment taxes of Robinson Enterprises. After Ms. Thames processed the payment and completed various forms, the meeting concluded.

Eventually, Robinson Enterprises was granted an abatement of certain tax penalties (that preceded the penalties paid on May 12, 2006), as these penalties were related to "the first incident of non compliant behavior." Def.'s App. at 289. Although plaintiff sought further refunds and abatements, these were denied. Def.'s Facts ¶¶ 85–86. Plaintiff then filed suit in this court for a refund of most of his payment of $12,279.22, pursuant to 26 U.S.C. § 7422 (2006). Plaintiff alleges that the payment he made on May 12, 2006 was made under duress.

## DISCUSSION

### I. Standards of Review

The court acknowledges that Mr. Robinson is proceeding *pro se,* and is "not expected to frame issues with the precision of a common law pleading." *Roche v. U.S. Postal Serv.,* 828 F.2d 1555, 1558 (Fed.Cir.1987). *Pro se* plaintiffs are entitled to a liberal construction of their pleadings. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers"). Accordingly, the court has examined the complaint and briefing thoroughly and has attempted to discern all of plaintiff's legal arguments.

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). However, plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds,* 846 F.2d at 748 (citations omitted). If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

The party moving for summary judgment will prevail "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." RCFC 56(c)(1). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997) (citing *United States v. Fred A. Arnold, Inc.,* 573 F.2d 605, 606 (9th Cir.1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting former version of Fed. R.Civ.P. 56(c)). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987) (internal quotations and citations omitted).

## II. Analysis

This case presents two substantive legal questions, the answers to which are provided by precedential cases from the United States Court of Claims and the United States Court of Appeals for the Federal Circuit, whose decisions are binding on this court. The first question is whether 26 U.S.C. § 7422 permits a plaintiff before this court to seek a refund of his payment of the tax liabilities of another. The second is whether duress, as defined by binding precedent, led to the payment for which plaintiff seeks restitution. If that payment was made under duress, this suit may go forward. If, however, the undisputed material facts show that duress was not present, plaintiff volunteered his payment and cannot recover any funds from the United States in this court. Also before the court are plaintiff's requests for relief under 26 U.S.C. § 7433 (2006), punitive damages, administrative fees, and the costs of this suit.

## A. Suits for Refund under 26 U.S.C. § 7422 Are Not Available to Third–Party Payers

There is a long history of refund suits before this court, or its predecessor courts, brought by persons who paid the tax liabilities of others. This court is therefore not free to interpret § 7422 anew, but must follow precedential guidance as to the proper application of the statute. *See, e.g., Crowley v. United States,* 398 F.3d 1329, 1335 (Fed. Cir.2005) (warning that this court should first review binding precedent for the interpretation of a statute, rather than engaging in a *de novo* analysis of the meaning of the statute). For purposes of plaintiff's suit, the key concept in any analysis of § 7422 is the identity of the "taxpayer." Plaintiff insists that because he paid the tax liability of Robinson Enterprises to the IRS, that act qualifies him as a "taxpayer" for purposes of § 7422 and a tax refund suit. *See* Compl. at 3; Pl.'s Mot. ¶ 4; Pl.'s Reply § I.

Unfortunately for plaintiff, the Court of Claims has rejected his interpretation of § 7422. For example, in *Economy Plumbing & Heating Co. v. United States,* 470 F.2d 585 (Ct.Cl.1972), the court stated that the Internal Revenue Code (I.R.C.) construes the term "taxpayer" in a "strict or narrow sense ... [;] mean[ing] a person who pays, overpays, or is subject to pay his own personal income tax." *Id.* at 590 n. 3 (citing 26 U.S.C. § 7701(a)(14) (2006)). Third-parties who pay the tax liabilities of others are thus not permitted to bring suit under § 7422. *See, e.g., Collins v. United States,* 532 F.2d 1344, 1347 n. 2 (Ct.Cl.1976) ("In order to maintain an action for the refund of taxes under the Internal Revenue Code, the plaintiff must be the taxpayer who has overpaid his own taxes.") (citation omitted); *Document Mgmt. Grp. v. United States,* 11 Cl.Ct. 463, 465 (1987) (noting that the Court of Claims has consistently held that "third parties ... are not 'taxpayers' and cannot avail themselves of I.R.C. § 7422(a) jurisdiction") (citations omitted). The undisputed facts before the court show that Mr. Robinson paid the tax liability of Robinson Enterprises, not his own tax liability. As a third-party payer of another's tax liability, he may not bring a suit

for refund under 26 U.S.C. § 7422.[5]

## B.  Precedent Regarding Duress

The Court of Claims has recognized that denying relief to a third-party payer of the tax liabilities of another would be unjust, if the payment to the United States was obtained wrongfully. *Kirkendall v. United States*, 31 F.Supp. 766, 769 (Ct.Cl.1940). The seminal holding of *Kirkendall* offered to third-party payers of tax liabilities a different basis to recover their payments—instead of a tax refund suit permitted by the I.R.C., the court asserted jurisdiction based on this court's implied contract jurisdiction. *See id.* ("When the Government has illegally received money which is the property of an innocent citizen and when this money has gone into the Treasury of the United States, there arises an implied contract on the part of the Government to make restitution to the rightful owner under the Tucker Act ... and this court has jurisdiction to entertain the suit."). Later, controlling cases interpreted *Kirkendall* to support implied contract jurisdiction for these third-party payers of tax only if the tax payments at issue were made under duress and were thus not voluntary. *E.g., Collins*, 532 F.2d at 1348; *Fidelity & Cas. Co. of N.Y. v. United States*, 490 F.2d 960, 967 (Ct.Cl.1974) (*Fidelity*); *J.C. Pitman & Sons v. United States*, 317 F.2d 366, 369 (Ct.Cl.1963).

■ "A comprehensive definition of the circumstances constituting duress is impossible; this court has pointed out that each case must be decided on its own facts." *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1042 (Ct.Cl.1976) (citation omitted). Nonetheless, certain general characteristics of duress have been identified. *Id.* Three elements define "situations where duress has been found to exist ...: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 951 (Ct.Cl.1953) (citations omitted). The Federal Circuit has stated that "the requirements to establish duress are exacting." *Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed.Cir.1985).

■ "To render an agreement voidable on grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree." *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct.Cl.1981) (citation omitted); *see Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed.Cir.1983) (*Systems Technology*) (citing *David Nassif* and other cases to explain that "[t]he standard [for duress] now looks more closely at the defeat of the will of the party coerced"). It is also important to note that duress is measured by an objective, not subjective, standard. *Christie v. United States*, 518 F.2d 584, 587 (Ct.Cl.1975) (stating that "[d]uress is not measured by the employee's subjective evaluation of a situation ..., the test [for determining whether an employee's resignation was obtained under duress] is an objective one") (citations omitted). Finally, in the tax arena, the burden of proving duress is on the third-party payer of another's tax liability. *Collins*, 532 F.2d at 1348. The court turns to a few representative precedential cases which discuss duress in factual circumstances not unlike those presently before the court.

### 1. *Beatty*

In *Beatty v. United States*, 168 F.Supp. 204 (Ct.Cl.1958), ranchers and farmers were convinced by representatives of the United States to sell their land to the government, and later brought suit claiming the sales were obtained under duress. The Court of Claims, assuming the facts alleged by the plaintiffs were true, reported that the plain-

---

5. Even if plaintiff could have brought a § 7422 action for the payment of Robinson Enterprises' taxes, defendant points out that his complaint was filed too late to fall within the limitations period imposed by 26 U.S.C. § 6511 (2006). Def.'s Mot. at 18–19. Defendant also maintains that even a complaint filed by Robinson Enterprises, Inc. on March 5, 2009, the date plaintiff filed his complaint, would have been barred by the limitations period imposed by 26 U.S.C. § 6532(a)(1) (2006). *Id.* at 19 n. 9.

tiffs said that "they were told that if they did not sell their properties to the Government at the appraised price, they would be condemned, and that in that event they would have to pay lawyer's fees, which would eat up the amount awarded them, and that it would take many years, perhaps as many as 25, for them to get any money out of it." *Id.* at 206. Upon examination of the threat of legal action in particular, the court held that "[i]t is not duress for a party to do or threaten to do what it has a legal right to do." *Id.* at 207. As to the exaggeration of the toll of condemnation proceedings on the plaintiffs, the court noted that "it was only necessary for them to consult their lawyers to learn that [these exaggerated predictions were] false." *Id.* The court concluded that the decision to sell was the plaintiffs' choice to make, and that the sales were not obtained by duress. *See id.* ("They were completely free to [sell or undergo condemnation proceedings]; they have no right to complain of the choice they made.").

### 2. *Mills*

In another real estate sale case, *Mills v. United States*, 410 F.2d 1255 (Ct.Cl.1969), the heirs of a property owner sued to cancel a deed of land to the United States. The plaintiffs alleged that threats by government representatives constituted duress and forced the sale:

> [T]his deed should be cancelled because Mrs. Sawhill [the plaintiffs' mother] was under great pressure to sell, that she did so for grossly inadequate consideration and because defendant misstated Mrs. Sawhill's legal position to her. To support their claim plaintiffs allege that Mrs. Sawhill was a widow 80 years of age with little formal education. They state that she greatly feared legal proceedings and that she was pressured into selling her property at far less than its value to avoid condemnation proceedings. Plaintiffs allege that the threat by the defendant that it would institute condemnation proceedings was what forced Mrs. Sawhill to sell and that the threats constituted duress.

*Id.* at 1257. The court held that proposing condemnation, an alternative to a mutually acceptable sale figure which the government

"had every legal right to pose," did not constitute duress. *Id.* The court also noted that recourse to counsel is an option for those dealing with government representatives at a negotiation:

> Ordinarily one having need of legal advice will retain counsel and not take it from the other side of the negotiating table. Purchase and sale of real estate is a kind of transaction where retention of counsel is ordinary and usual. The relationship of the parties was not such that it was reasonable for one side to have relied on the representations of the other.

*Id.* at 1258.

### 3. *Fidelity*

A surety furnished payment and performance bonds to a contractor, and later made payments to satisfy the withholding tax liabilities of the contractor, which was unable to meet its financial obligations while performing certain contracts. *Fidelity*, 490 F.2d at 961–62. It was clear that the surety had begun managing the financial affairs of the contractor, and had paid the contractor's taxes and other obligations to protect the surety's interest in the completion of the contracts. *Id.* The plaintiff surety later filed suit for a tax refund of payments it had made on behalf of the contractor, stating that these payments were made under duress. *Id.* at 961.

According to the plaintiff, the IRS threatened to shut down the contractor's operations, and also threatened the surety's employees with civil and criminal penalties if the taxes were not paid. *Fidelity*, 490 F.2d at 963. One of these threatened actions eventually occurred when the surety stopped paying the taxes of the contractor, and steps taken by the IRS forced the contractor to shut down its operations. *Id.* As to the threats against the surety's employees, the court noted that these employees could have consulted the firm's attorney to learn the exact extent of their personal liability (which was none). *Id.* at 965 n. 8. The court also cited *Mills*, 410 F.2d at 1257, for the proposition that "representations as to questions of law generally will not form a basis for setting

aside completed transactions." *Fidelity,* 490 F.2d at 965 n. 8.

Reviewing the circumstances of the tax payments by the surety, the court concluded that "[e]ven viewed in a light most favorable to plaintiff, the actions of [the] IRS in the circumstances surrounding payment of the taxes by plaintiff cannot be considered so overpowering as to have inhibited plaintiff from the unfettered exercise of its reasoned judgment." *Id.* at 966. The court also remarked that the surety could easily have considered the tax payments to be advances to the contractor. *Id.* In light of these circumstances, the court held that "duress was not present when plaintiff paid the taxes in question." *Id.* at 964.

### 4. *Collins*

Mr. Collins had dealings with the IRS related to his personal income tax returns, as well as the returns of his corporation, Summertime Cafe, Inc., which he had sold by the time he met with IRS agents. *Collins,* 532 F.2d at 1346. One of the IRS agents explained to Mr. Collins that the corporation's taxes were higher than the amount Mr. Collins had paid, and that he might be personally responsible for any deficiency. *Id.* The agent explained that depending on the nature of the sale of the corporation, either Mr. Collins or the new owner of the corporation might be responsible, and if the new owner were responsible, that person might "look to" Mr. Collins to satisfy the liability. *Id.* When asked for a copy of the corporate sale documents, "Mr. Collins became visibly agitated and stated that he did not want to go into the sale and that he would pay the taxes." *Id.*

As the negotiations with the IRS continued, Mr. Collins' unpaid personal tax liability amounted to less than thirty dollars. *Collins,* 532 F.2d at 1347. The corporation's deficiencies were larger, and after retaining counsel, Mr. Collins paid approximately $3750 to satisfy the corporation's tax liabilities. *Id.* He later sued for a refund, and the Court of Claims determined that the "issue is whether the plaintiff was a volunteer in paying the taxes of Summertime Cafe, Inc." *Id.*

The court made several key findings regarding the elements necessary to establish duress, citing *Fruhauf Southwest,* 111

F.Supp. at 951. First, the court held that "there is no evidence of the involuntary acceptance of terms dictated by the Internal Revenue Service." *Collins,* 532 F.2d at 1348. Although an IRS agent might have misinformed Mr. Collins as to his liabilities, the information which would have shown Mr. Collins that he was not responsible for the corporation's taxes was readily available, and he had access to counsel. *Id.* at 1348–49. The court stated that "[i]gnorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence." *Id.* at 1348 (citing *United States v. Ames,* 99 U.S. 35, 47, 25 L.Ed. 295 (1878)). Mr. Collins' payment of the corporation's tax liabilities was thus voluntary, not involuntary. *Collins,* 532 F.2d at 1349.

The court also determined that Mr. Collins had alternatives to payment, which his lawyer could have pursued for him. *Id.* Finally, as to any coercive acts of the IRS, the court held that in the circumstances of that case, the misrepresentations of the law communicated to Mr. Collins, made well before he consulted his lawyer and paid the sum over to the IRS, were not coercive. The court also noted that absent unusual circumstances, a party in negotiation with the government has no right to depend on "'representations as to questions of law'" provided by the government agent. *Id.* at 1349 (quoting *Mills,* 410 F.2d at 1257). The court concluded that none of the elements of duress were present in that case. *Id.* at 1348.

### C. Mr. Robinson's Payment Was Not Made under Duress, as Duress is Defined by Binding Precedent

### 1. Mr. Robinson Did Not Involuntarily Accept the Terms of the IRS

■ As shown by the *Collins* case, a third-party taxpayer who chooses not to investigate the extent of the tax liabilities asserted by the IRS cannot later claim that his volunteered payment of those liabilities was involuntary. Here, Mr. Walsh already represented Robinson Enterprises in its dispute with the IRS, and presumably had adequate knowledge of IRS collection practices. If

Mr. Robinson had exercised reasonable diligence, Mr. Walsh would either have been invited to the May 12, 2006 meeting or would have been consulted before full payment was offered to Ms. Thames. *See Collins*, 532 F.2d at 1348–49 (noting that the payment of a tax liability on an IRS agent's terms cannot be involuntary if the payer of the tax could have obtained better advice through the exercise of reasonable diligence).

■ The court also notes that Mr. Robinson was not unaware of the value of counsel, having engaged Mr. Walsh to represent him and his wife in a dispute with the IRS. Even if his own knowledge of tax law was not sufficient to question the validity of a threat to have Peyton arrested and jailed, he could not reasonably rely on Ms. Thames to give him legal advice. *See, e.g., Mills*, 410 F.2d at 1258 ("The relationship of the parties was not such that it was reasonable for one side to have relied on the representations of the other."). If the threat expressed by Ms. Thames was exaggerated and essentially inaccurate,[6] recourse to counsel would have allayed Mr. Robinson's fears.[7] Mr. Walsh would also have been able to explain to Mr. Robinson that only a portion of the amount owed by Robinson Enterprises could be attributed to the corporation's officers. In these circumstances, Mr. Robinson's payment cannot be construed to be involuntary or to have been made under duress, because he chose to forgo the advice of counsel and made the $12,279.22 payment to the IRS in total reliance on the statements of Ms. Thames.

### 2. Reasonable Alternatives Were Available to Mr. Robinson

As a preliminary observation, the court notes that Mr. Robinson cannot be characterized as an unsophisticated individual at the mercy of Ms. Thames. As was noted in *Beatty*, "minors and incompetents" might have a stronger case for duress. 168 F.Supp. at 206. When intelligent individuals have access to counsel and are not subjected to high-pressure tactics, however, the government's threats of legal action are not usually sufficient to overcome the free will of these persons. *Id.* at 206–07. Both Robinson Enterprises and Mr. Robinson were represented by Mr. Walsh at this time. Ms. Thames was, by all accounts, firm but not aggressive or disrespectful. Def.'s Facts ¶ 66. Mr. Robinson was thus free to make reasonable choices, and the facts alleged by plaintiff to have occurred at the May 12, 2006 meeting show that Mr. Robinson had reasonable alternatives available to him.

First, it must be noted that Mr. Robinson could have chosen to take a less active role in his son's dispute with the IRS. He was not urged by the IRS to attend the meeting; rather, the meeting was set up by plaintiff. He could have invited Mr. Walsh, but he did not. He went into the meeting prepared to pay some portion of Robinson Enterprises' tax liabilities, and offered to pay half. He could have offered nothing. He could have called Mr. Walsh before making the payment of $12,279.22, but he did not. He could have consulted with his daughter-in-law Angela, a CPA who was present at the meeting, but he apparently did not. Def.'s Facts ¶ 72. Because duress is only present when "no reasonable alternative" is available to the claimant, *David Nassif*, 644 F.2d at 12, Mr. Robinson was not under duress when he volunteered to fully pay the tax liabilities of Robinson Enterprises that were identified by Ms. Thames.

### 3. The Circumstances of the May 12, 2006 Payment Were Not the Result of Coercive Acts of the IRS

The test for government coercion is no longer dependent, as it was in some older

---

6. Plaintiff appears to argue that appropriate procedures were not followed before imposing the corporation's liabilities on his son Peyton. Pl.'s Mot. at 3–4. The allegations of fact before the court, however, indicate that the meeting on May 12, 2006 was in furtherance of the collection of taxes, penalties and interest from Robinson Enterprises, not Peyton Robinson. It was only after plaintiff posed the hypothetical question of non-payment to Ms. Thames that she outlined the steps that would be taken against Peyton Robinson.

7. The court notes that Mr. Robinson's family history made him especially sensitive to a threat to arrest and incarcerate his son. Duress is measured, however, by an objective standard, not by an individual's subjective interpretation of the circumstances with which he is confronted. *Christie*, 518 F.2d at 587.

cases, on an assessment of the legality of the action threatened by the government. *Systems Technology*, 699 F.2d at 1386–88. Thus, the court need not decide whether Ms. Thames' alleged threat of arrest and jail for Peyton was indeed an action that the IRS could pursue. *See* Def.'s Mot. at 25–27 (discussing criminal charges that might be brought against someone in Peyton Robinson's position). Instead, the court must measure, from an objective standpoint, whether the threat allegedly made by Ms. Thames would be enough to "defeat ... the will of the party coerced." *Systems Technology*, 699 F.2d at 1387.

In the court's view, the pressures on Mr. Robinson to help his son Peyton were only in part due to the statements of Ms. Thames at the May 12, 2006 meeting. Plaintiff had become the financial safety net for his son, and had loaned significant amounts of money to Robinson Enterprises. He apparently felt that he was the only person who could come to the financial rescue of the business and his son. *See* Def.'s Facts ¶¶ 60, 62, 70, 74 (showing that plaintiff went into the meeting planning to offer financial assistance, if needed, that he made an offer to pay half of the tax liability of Robinson Enterprises, and that he would have made the payments on an installment payment plan to pay off that tax liability). Mr. Robinson was personally covering checks written by Robinson Enterprises, after the IRS had levied upon the corporation's bank account. All of this pressure to pay the corporation's tax liability arose from plaintiff's relationship with his son and plaintiff's financial ties to Robinson Enterprises, and was independent from the statement made by Ms. Thames at the meeting on May 12, 2006.

The facts alleged by plaintiff do not show that the $12,279.22 payment was coerced from plaintiff, but rather that the threat of Peyton's imprisonment was one of the circumstances which influenced plaintiff to make the $12,279.22 payment. To constitute duress, the government's acts must be weighed to determine if they alone are of sufficient "coercive effect." *See Systems Technology*, 699 F.2d at 1388–89 & n. 20 (reviewing any delays and unfair acts that

could be attributed to the government in order to determine whether these were sufficiently coercive to force a contractor to enter into a settlement agreement). The court concludes that, from an objective standpoint, Ms. Thames' threats against Peyton do not constitute coercion, because a reasonable person, particularly one who, like Mr. Robinson, was represented by a tax attorney, would have been able to resist these threats and would have been able to make a free choice to not pay the tax liabilities of Robinson Enterprises.

It is also important to note that this is a case where the alleged threat by the government was directed at another, not the plaintiff. In the court's view, the coercive force of a threat diminishes when the focus of the threat is on another person. The government act at issue here is thus fundamentally different from the acts at issue in *Kirkendall*, a seminal duress case in this circuit. *See J.C. Pitman*, 317 F.2d at 369 (noting that in *Kirkendall*, "the element of seizure by the Government supplied the necessary amount of property duress"). In *Kirkendall*, a man in very frail physical condition was "rigorously and tirelessly questioned by the police, a postal inspector, and an assistant state's attorney until he was exhausted," and the next day died within hours of his release from the prison hospital. 31 F.Supp. at 767. Funds belonging to him and his wife were confiscated, based on his confession, and applied to the tax liabilities of a confederate. *Id.* The Court of Claims held that these funds were "wrongfully obtained"; in essence, the government's interrogation and threats of imprisonment constituted duress in that case. *See id.* at 769. In this case, threatening Mr. Robinson's son with an arrest warrant and eventual imprisonment falls far short of the example of duress provided in *Kirkendall*.

Where duress has been found in less dramatic circumstances, typically the government wrongfully contributed to the economic distress of the plaintiff, and then took advantage of that economic distress to obtain an unfair and unconscionable bargain. *See, e.g., Aircraft Assocs. & Mfg. Co. v. United States*, 357 F.2d 373, 379 (Ct.Cl.1966) (finding duress where "there [wa]s no question that the Gov-

ernment's wrongful [acts] contributed substantially to plaintiff's financial distress"); *James Shewan & Sons v. United States*, 73 Ct.Cl. 49, 84 (1931) (finding duress where "the critical situation in which the plaintiff found itself is attributable in whole to the [government's] course of conduct and proceedings"). Here, the financial distress of Robinson Enterprises was not wrongfully caused by the IRS, because there is no dispute that the collection actions of the IRS were founded upon legitimate claims against the corporation.[8] Furthermore, there is no evidence that the IRS wrongfully contributed to the economic distress experienced at this time by Mr. Robinson. Thus, the threat against Peyton Robinson did not constitute duress imposed upon plaintiff, Mr. David Robinson, as duress has been defined by precedent in this circuit.[9]

### D. Plaintiff's Other Claims

In plaintiff's cross-motion, plaintiff adds a new jurisdictional allegation, that of a claim under 26 U.S.C. § 7433, a statute which is titled "Civil damages for certain unauthorized collection actions [by the IRS]." To the extent that this allegation is an informal amendment of the complaint, the court agrees with defendant that this court lacks jurisdiction over claims brought under § 7433, because such claims must be brought in a United States District Court.[10] *E.g., Dumont v. United States*, 85 Fed.Cl. 425, 429–30 (2009). Plaintiff's request for punitive damages against the United States fares no better—this court cannot hear tort claims,

and, in any case, punitive damages are not available against the United States. *See* 28 U.S.C. §§ 1491(a)(1), 2674 (2006); *Garner v. United States*, 230 Ct.Cl. 941, 943 (1982) (citations omitted). Finally, because plaintiff has not succeeded on the merits of his claims, the court has no statutory basis to award him the fees and costs of his suit.

### CONCLUSION

This court cannot grant plaintiff relief under 26 U.S.C. § 7433, nor can this court grant punitive damages against the United States. Defendant's motion to dismiss portions of the complaint for lack of jurisdiction is therefore granted. Plaintiff is not entitled to sue under 26 U.S.C. § 7422 for a tax refund for payments made to satisfy the tax liabilities of another, and his payment to the IRS was not made under duress, as precedent of this court defines that term. Defendant's motion for summary judgment is therefore granted. These rulings dispose of plaintiff's claims, and the complaint in its entirety must be dismissed.

Accordingly, it is hereby **ORDERED** that

(1) Defendant's Motions to Dismiss the Complaint in Part and for Partial Summary Judgment, filed June 1, 2010, are **GRANTED;**

(2) Plaintiff's Cross Motion for Summary Judgment, titled "Motion to Rule Affirmative for Plaintiff" and filed July 9, 2010, is **DENIED;**

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defen-

---

**8.** Defendant asserts that Ms. Thames correctly refused to agree to an installment payment plan, because Robinson Enterprises failed to perform certain prerequisite tasks in order to become "current" and eligible for such a plan. Def.'s Mot. at 11, 13. Plaintiff contends that Robinson Enterprises was "current" with its tax payments and form filings as of May 12, 2006, once he made his full payment of the tax liability asserted by the IRS at that time, and that "[t]his should have qualified Robinson Enterprises for an installment [plan]." Pl.'s Reply § II. Whether or not the payment received from Mr. Robinson rendered the corporation "current" is not the issue. By all accounts, Ms. Thames' refusal to agree to an installment plan occurred before plaintiff made the payment of $12,279.22. The appropriateness of her refusal to agree to an installment plan must be measured by the perti-

nent contemporaneous circumstances, not the circumstances subsequent to plaintiff's payment of the corporation's tax liability.

**9.** Even if Ms. Thames' threat to have Peyton Robinson arrested and jailed could objectively be seen to be sufficiently coercive, the other two prongs of the *Fruhauf Southwest* test for duress, 111 F.Supp. at 951, are not present in this case, as discussed *supra*. Thus, Mr. Robinson's payment was not made under duress.

**10.** Section 7433 does not appear to permit plaintiff's claim to be brought in a United States District Court, even if transferred from this court, because any such claim would most likely be barred by the applicable statute of limitations for such actions. 26 U.S.C. § 7433(d)(3).

dant, **DISMISSING** the complaint; in particular, plaintiff's requests for punitive damages and for relief under 26 U.S.C. § 7433 are **DISMISSED** without prejudice; all of plaintiff's other claims—under 26 U.S.C. § 7422, under an implied contract with the United States, and for fees and costs—are **DISMISSED** with prejudice; and

(4) Each party shall bear its own costs.